UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| GREENCYCLE PAINT, INC.,<br><br>       Plaintiff,<br><br>    v.<br><br>PAINTCARE, INC., et al.,<br><br>       Defendants. | Case No. 15-cv-04059-MEJ<br><br>**ORDER RE: SECOND MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 50-52 |

## INTRODUCTION

Plaintiff GreenCycle Paint, Inc. ("Plaintiff") alleges Defendants PaintCare, Inc. ("PaintCare"); Clean Harbors Environmental Services, Inc. ("Clean Harbors"); and Stericycle Environmental Solutions ("Stericycle") (collectively, "Defendants") violated California's antitrust and unfair competition laws by conspiring to exclude Plaintiff from the recycled paint market. The Court dismissed Plaintiff's initial complaint but granted Plaintiff leave to amend on all claims, which Plaintiff has done. Order, Dkt. No. 47; *see* First Am. Compl. ("FAC"), Dkt. No. 48. Defendants now again move to dismiss all claims. Clean Harbors Mot., Dkt. No. 50; PaintCare Mot., Dkt. No. 51; Stericycle Mot., Dkt. No. 52. Plaintiff filed a single Opposition to Defendants' Motions. Opp'n, Dkt. No. 57. Clean Harbors and PaintCare each filed a Reply (Clean Harbors Reply, Dkt. No. 62; PaintCare Reply, Dkt. No. 63); Stericycle joins both Replies (Dkt. No. 65). Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motions for the following reasons.

//

//

# BACKGROUND

## A. Defendants and the PaintCare Program

The American Coatings Association ("ACA") is the primary trade association of the paint and coatings industry and represents, among other things, paint and coatings manufacturers. FAC ¶ 10. The ACA created and is the sole member of PaintCare, which represents paint manufacturers in their efforts to plan and operate paint stewardship programs. *Id.*

In 2010, California enacted the statewide Architectural Paint[1] Recovery Program (the "Program"), Cal. Pub. Res. Code § 48700 et seq., to reduce leftover paint, promote its reuse and recycling, and properly manage unwanted leftover paint. *Id.* ¶¶ 8, 13. The California Department of Resources Recycling and Recovery ("CalRecycle") is the state agency that oversees the Program. *Id.* ¶ 9. In 2012, CalRecycle designated PaintCare as the sole steward for the Program; PaintCare was the only stewardship organization that submitted a paint stewardship plan to CalRecycle to implement a paint recovery program (the "PaintCare Program"). *Id.* ¶ 8. Clean Harbors and Stericycle (together, the "Hauler Defendants") are haulers that work with PaintCare to transport post-consumer paint collected under the PaintCare Program. *Id.* ¶ 23.

To fund the PaintCare Program, consumers pay an additional $0.35 to $1.60 assessment on all architectural paint sold in California. *Id.* ¶ 11. PaintCare receives 100% of these assessments, and uses them to pay for collection bins, training materials, transportation of paint from collection sites, and paint processing. *Id.* In 2015, PaintCare collected approximately $34 million in assessments. *Id.* ¶ 12.

## B. Plaintiff's Efforts to Join the PaintCare Program

Plaintiff was founded in 2012 as a latex paint processor and manufacturer. *Id.* ¶ 21. It opened a latex paint recycling facility in Oakland, California; while operating, it was the only latex paint recycler in the San Francisco Bay Area. *Id.*; *see id.* ¶¶ 19, 43.

---

[1] "Architectural paint" is defined as "interior and exterior architectural coatings, sold in containers of five gallons or less for commercial or homeowner use, but does not include aerosol spray paint or coatings purchased for industrial or original equipment manufacturer use." Cal. Pub. Res. Code § 48701(a).

In April 2012, Plaintiff's Chief Executive Officer, Alan Beilke, entered into discussions with PaintCare about participating in the PaintCare Program as a latex paint processor. *Id.* ¶ 22. PaintCare introduced Plaintiff to Stericycle and Clean Harbors (together, the "Hauler Defendants"). *Id.* ¶ 23. Plaintiff thereafter received contradictory information about the approval process from Defendants. *See id.* ¶ 24. PaintCare advised Plaintiff to go through the Hauler Defendants to facilitate receipt of paint under the PaintCare Program. *Id.* PaintCare represented that recyclers had to enter into contracts with the Hauler Defendants and that the Hauler Defendants decided which recycling facilities received post-consumer paint. *Id.* ¶¶ 23-24. But according to Fred Gabriel of Clean Harbors, PaintCare had to approve Plaintiff as a recycler before Clean Harbors could audit or approve Plaintiff for the receipt of paint. *Id.* ¶ 24.

In September 2012, Plaintiff again met with Defendants' representatives to discuss Plaintiff's desire to participate in the PaintCare Program as a recycler. *Id.* ¶ 25. Glen Dilman of Stericycle informed Beilke that Plaintiff needed to establish a paint recycling facility that was ready to receive post-consumer paint before Stericycle would arrange an audit, which was required prior to Plaintiff's approval to receive used paint. *Id.*

That month, Plaintiff moved into a 5,000 square foot facility. *Id.* ¶ 26. It was ready to receive and process paint in November 2012. *Id.* By December 2012, Plaintiff had done everything Defendants required to become an approved latex paint recycling facility and receive paint under the PaintCare Program. *Id.* ¶ 27. Plaintiff also established its own relationship with a household hazardous waste program to receive post-consumer paint and began to receive and process paint from this source. *Id.* ¶¶ 27-28. Prior to closing, Plaintiff was in discussions with the cities of Hayward and Emeryville, Alameda County, and the Bay Area Rapid Transit ("BART") district to sell recycled paint to them. *Id.* ¶ 17.

Between April 2012 and April 2015, Plaintiff repeatedly met with and spoke to each Defendant about receiving paint under the PaintCare Program, and Defendants took actions that led Plaintiff to believe that it would be approved to receive post-consumer paint. *Id.* ¶¶ 21-40. Over the course of dozens of discussions and meetings, Plaintiff was led to believe that it would receive paint under the PaintCare Program. *See id.* ¶ 30 (Mark "Winkler of Stericycle told

GreenCycle that Stericycle had 3-4 truckloads of paint per month that needed a processor, and that GreenCycle would be a suitable processor."). Defendants' message was that as long as Plaintiff complied with certain requirements first, then it would receive paint under the PaintCare Program. *Id.* ¶¶ 29, 46. Despite meeting those requirements, Plaintiff did not receive paint from Defendants. *See id.* ¶¶ 27, 29.

Plaintiff raised its concerns at a July 2014 meeting with Defendants, CalRecycle, and CalEPA. *Id.* ¶ 32. CalRecycle's Howard Levensen urged Defendants to increase the amount of paint being recycled in the Bay Area by using facilities like Plaintiff's for paint that is collected in Alameda, Contra Costa, and other Bay Area counties. *Id.* Bill Pollock, the Program Director of the Alameda County Household Hazardous Waste Program, spoke directly with Gabriel about using Plaintiff instead of shipping paint to an out-of-state facility. *Id.* ¶ 33. Gabriel and Kurt Locke, also with Clean Harbors, immediately visited Plaintiff's facility to make sure Plaintiff could receive Clean Harbors' roll-off bins and, in August 2014, told Plaintiff that Clean Harbors would mail an audit package for it to complete. *Id.* ¶¶ 33-34. Plaintiff did not receive the package. *Id.* ¶ 34.

In April 2014, Stericycle approved Plaintiff as a recycler for used latex paint. *Id.* ¶ 31. But Plaintiff did not receive its first shipment of paint under the PaintCare Program until January 2015; it received its second and final shipment in March 2015. *Id.* ¶¶ 31, 40. Plaintiff received only two shipments despite the fact that the amount of latex paint collected in California has increased by approximately 1.4 million gallons—approximately 700 truckloads—since the first year after the adoption of the Architectural Paint Recovery Program. *Id.* ¶ 41. The lack of used latex paint and the realization that it was not going to receive paint under the PaintCare Program forced Plaintiff to shut down its paint recycling operations in April 2015. *Id.*

C.    **The Alleged Conspiracy**

Plaintiff contends it was unable to obtain paint because Defendants entered into a secret agreement to exclude Plaintiff as a recycler under the PaintCare Program in order to reduce the amount of recycled paint that was available in the San Francisco Bay Area market. *Id.* ¶¶ 29, 36, 40. PaintCare knew that the availability of recycled paint was a threat to the profits of its

members—the largest paint manufacturers in the country. *Id.* ¶¶ 10, 14-16, 18. The ACA, PaintCare, and paint manufacturers are concerned about the negative impact that the sale of recycled paint, which sells at a discount compared to mid and high-grade paint products, has on their revenue and profits. *Id.* ¶¶ 15-18. Although collection facilities are concentrated in urban areas, the paint collected in the Bay Area is shipped out of state, which increases total program costs. *Id.* ¶ 13. The Hauler Defendants agreed to go along with PaintCare's plan to exclude Plaintiff from the market because they received larger payments for transporting paint to more distant facilities in Sacramento and out-of-state. *Id.* ¶¶ 20, 48, 53. This also reduced competition for paint sales in the Bay Area and maintained sales and profits of PaintCare's members. *Id.* ¶ 48. Defendants knew that they were excluding an otherwise qualified recycler from the market. *Id.* ¶ 41.

Defendants' actions also harmed Bay Area consumers by depriving them of the opportunity to purchase as much as 100,000 gallons of recycled paint per year, and misled all California consumers by increasing costs over those necessary to run the program. *Id.* ¶ 13. Recycled paint sells for significantly less than newly-produced, or "virgin" paint; for instance, Plaintiff had a contract to sell recycled paint to the City of Oakland for $10 per gallon, while the cost of virgin paint typically sells for $25 to $75 per gallon. *Id.* ¶ 17. Moreover, consumers pay the costs for increased transportation through the recycling fee assessed on each gallon of virgin paint; if Defendants used local paint recyclers, that assessment could be reduced. *Id.* ¶ 48.

### LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

5

allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals omitted). In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Id.* at 550.

### DISCUSSION

The FAC asserts two claims, the first under the Cartwright Act, Cal. Bus. & Prof. Code § 16720, and the second under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. *Id.* ¶¶ 44-57. Defendants seek to dismiss both claims.

**A.      Cartwright Act Claim**

1.      Standard of Pleading

The Cartwright Act makes unlawful a "trust," defined as a combination of capital, skill, or acts by two or more persons or businesses to restrict trade, limit production, increase or fix prices, or prevent competition. Cal. Bus. & Prof. Code §§ 16702, 16720. The purpose of the Cartwright Act is to prevent any action which "has as its *purpose* or *effect* an unreasonable restraint of trade." *Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 22 Cal. 3d 302, 314 (1978) (emphasis in original) (citations omitted); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1000 (9th Cir. 2008) (recognizing same).

"California courts" demand a "high degree of particularity in the pleading of Cartwright Act violations." *Facebook Inc. v. Power Ventures, Inc.*, 2009 WL 3429568, at *2 (N.D. Cal. Oct. 22, 2009) (internal quotation marks omitted) (discussing and applying *Twombly* to Cartwright Act claims). "It is not enough merely to include conclusory allegations that certain actions were the result of a conspiracy; the plaintiff must allege facts that make the conclusion plausible." *Name.Space*, 795 F.3d at 1129 (citing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008)). "This standard does not impose a 'probability requirement,' but 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

As such, "Cartwright Act claims are properly dismissed 'where the complaint makes conclusory allegations of a combination and does not allege with factual particularity that separate entities maintaining separate and independent interests combined for the purpose to restrain trade.'" *In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 320 (N.D. Cal. 2007) (quoting *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 189 (1999)). Among other things, when faced with two possible explanations for a defendant's behavior, a plaintiff cannot offer allegations that are "merely consistent with" their favored explanation but are also consistent with the defendant's alternative explanation. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citing *Iqbal*, 556 U.S. at 678). "Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, . . . in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* But where a plaintiff's allegations are stuck in "neutral territory," i.e., they do not tend to exclude the innocent explanation, such allegations fall short of what *Iqbal* and *Twombly* require. *See id.* at 1108-10 (affirming dismissal of Securities Act claim where plaintiffs' allegations were "merely consistent with both their explanation and the defendants' competing explanation"); *see also Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1116 (9th Cir. 2014), *cert. denied sub nom. Gonzalez v. Planned Parenthood of L.A., Cal.*, 135 S. Ct. 2313 (2015) (affirming dismissal where plaintiff's allegation that defendant knowingly submitted false claims was only "merely *possible* rather than plausible," and could not overcome the plausible and obvious explanation that defendant did not knowingly submit false claims (internal quotation marks omitted; emphasis in original)); *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (explaining that courts "must consider" "obvious alternative explanation[s]" for a defendant's behavior when analyzing plausibility); *Somers v. Apple, Inc.*, 729 F.3d 953, 965 (9th Cir. 2013) (affirming dismissal of antitrust claim in part due to an obvious alternative explanation for music pricing).

　　　　2.　　<u>Analysis</u>

　　　To establish liability under Section 1 of the Sherman Act (and consequently, the Cartwright Act), "a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836

F.3d 1171, 1178 (quoting *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189-90 (2010)).[2]

### a. *Agreement*

Plaintiff alleges facts to show that Defendants' acts were concerted. To plausibly plead a conspiracy, an antitrust plaintiff must allege "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4 (quoting 6 Areeda & Hovenkamp, Antitrust Law § 1425, at 167-85 (2d ed. 2003)). The conspirators must have a unity of purpose or a common design and understanding. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946); *see also William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 663 (9th Cir. 2009) ("Whether a plaintiff pursues a per se claim or a rule of reason claim . . ., the first requirement is to allege a 'contract, combination in the form of trust or otherwise, or conspiracy.'").

Plaintiff has now "plead[ed] not just ultimate facts (such as a conspiracy), but evidentiary facts" in support of the elements of its claims. *William O. Gilley Enters.*, 588 F.3d at 659. Plaintiff alleges that PaintCare—the sole stewardship organization of California's Architectural Paint Recovery Program—was created by the ACA, which is owned by the largest paint manufacturers in the country. FAC ¶¶ 8-10. The FAC alleges PaintCare considers recycled paint to be a threat to its owners' profits because virgin paint, sells for significantly more than recycled paint. *Id.* ¶¶ 14-18, 48. Plaintiff contends that to prevent cheaper recycled paint from competing with more expensive virgin paint in the lucrative Bay Area market, Defendants agreed that Clean Harbors and Stericycle would ship paint to more distant recycling facilities, thus removing the threat of recycled paint in the Bay Area to PaintCare's owners. *Id.* ¶ 20. In doing so, Defendants

United States District Court
Northern District of California

[2] "The analysis under [the Cartwright Act] mirrors the analysis under federal law because [it] was modeled after the Sherman Act." *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (citations omitted); *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015) ("Because analysis under the Cartwright Act is identical to that under the Sherman Act, we also affirm the district court's dismissal of the Cartwright Act claim." (citations omitted)).

also agreed to refuse to do business with Plaintiff to prevent it from recycling paint in the Bay Area (so Stericycle and Clean Harbors could collect higher payments for shipping[3]) and to prevent additional recycled paint from entering the Bay Area market (and risk competition with PaintCare's owners). *Id.* ¶¶ 20-21, 41. Plaintiff lists numerous examples where Defendants plausibly appear to have coordinated their efforts to prevent Plaintiff from entering the market and competing (*id.* ¶¶ 19-20, 23-25, 27, 29, 31, 33-34, 36, 39), which "reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation marks omitted); *see also Beltz Travel Serv. Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1366-67 (9th Cir. 1980) ("Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result.").

> b. *Unreasonable Restraint of Trade*

Plaintiff's FAC provides plausible allegations establishing both of these elements. While Plaintiff does not explicitly articulate a specific theory of antitrust liability (e.g., group boycott, refusal to deal, price-fixing, etc.)[4], it now provides sufficient factual allegations plausibly establishing Defendants agreed not to do business with Plaintiff with the "rationale or purpose" to exclude competition. *See Aerotec*, 2016 WL 4709868, at *9; *see also In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) (in antitrust conspiracy cases, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each . . . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts,

---

[3] PaintCare and Clean Harbors dispute this allegation. *See* PaintCare Mot. at 3; Clean Harbors Mot. at 7. On a motion to dismiss, resolution of such disputes of fact is inappropriate.

[4] The precise antitrust theory impacts whether the alleged conspiracy is properly considered as a vertical or horizontal restraint of trade and whether to apply a *per se* illegality analysis or "rule of reason" analysis. The Court need not decide now whether *per se* or rule of reason analysis applies; "that decision is more appropriate on a motion for summary judgment." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d at 1122 (citing cases).

but only by looking at it as a whole. . . ." (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

Although it is not necessary to determine whether the *per se* or rule of reason analysis applies at this stage, Plaintiff has alleged a theory of antitrust injury as well.  *See In re High-Tech Empl. Antitrust Litig.*, 856 F. Supp. 2d at 1122 (inappropriate to determine whether rule of reason or *per se* analysis applies until summary judgment); *Pecover v. Elecs. Arts Inc.,* 633 F. Supp. 2d 976, 983 (N.D. Cal. 2009) (for Cartwright Act claim, deferring market analysis under rule of reason until after deciding motion to dismiss).  "[T]he Cartwright Act, like all antitrust laws, is about the protection of *competition*, not *competitors*."  *Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 204 Cal. App. 4th 1, 20 (2012) (internal quotation marks and citations omitted; emphasis in original); *see also Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 198 Cal. App. 4th 1366, 1378 (2011), *as modified on denial of reh'g* (Sept. 29, 2011) ("[T]he antitrust injury requirement applies to cases alleging conduct that is per se unlawful as well as to cases governed by the rule of reason.").  "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."  *Flagship Theatres*, 198 Cal. App. 4th at 1379 (emphasis in original) (quoting *Atl. Richfield Co.*, 495 U.S. at 344).  "Vertical agreements that foreclose competitors from entering or competing in a market can injure competition by reducing the competitive threat those competitors would pose."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012). Additionally, "[s]ome types of vertical agreements can also injure competition by facilitating horizontal collusion."  *Id.* (citation omitted); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1199 n.3 (9th Cir. 2015) (antitrust conspiracy may include a so-called "rimless hub-and-spoke conspiracy" where "various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another other than the common defendant's involvement in each transaction.").

c.    *Beyond Neutral Territory*

Taking the allegations in the light most favorable to Plaintiff, the FAC now takes Plaintiff's allegations out of "neutral territory" and excludes the innocent explanations Defendants

offered that Plaintiff was somehow unqualified to accept recycled paint. *See In re Century Aluminum*, 729 F.3d at 1108. Plaintiff affirmatively alleges that even after it had done "everything that had been asked of it, and had continued to make efforts to meet each new requirement imposed upon it" Defendants still would not allow it to recycle paint. FAC ¶¶ 27, 29. Plaintiff alleges that "while it was in operation it was the only latex paint recycler in the San Francisco Bay Area" and other entities had successfully used it to recycle paint. *Id.* ¶¶ 21, 27, 38; *see also id.* ¶¶ 19-20, 41 (alleging Defendants shipped paint out of state for recycling, which all Defendants stand to profit from). But even after Stericycle approved Plaintiff as a recycler for used latex paid, Plaintiff did not receive a single gallon of used paint from Stericycle or any other hauler in the PaintCare program for eight months. *Id.* ¶¶ 31, 41 ("[D]efendants were aware of GreenCycle's successful track record in processing post-consumer paint, had visited the facility and had approved of its operations" but still did not send it paint). The Court previously noted Plaintiff's allegations that PaintCare was conspiring to suppress the recycling of latex paint "lack[ed] plausibility as it appears to run counter to the whole purpose of PaintCare's mission under the Program and for which CalRecycle has selected PaintCare." Order at 9. Plaintiff's new allegations clarifies PaintCare's motivation to allow its owners to sell the more expensive virgin paint and not having to compete with Plaintiff for selling more affordable recycled pain and makes the alleged conspiracy sufficiently plausible. This is particularly true as Plaintiff has plausibly pled it had done all Defendants asked of it to be qualified to receive paint for processing. *See Aerotec*, 2016 WL 4709868, at *9 (there is "no duty to deal under the terms and conditions preferred by a competitor's rivals," but there is a duty not to refrain from dealing where the "only conceivable rationale or purpose" is "to obtain higher profits in the long run from the exclusion of competition" (internal quotation marks and brackets omitted)); *cf. Name.Space, Inc.*, 795 F.3d at 1130 (9th Cir. 2015) ("[A]bsent allegations that suggest [defendant's] decisions were illogical or suspicious" rational, independent business decisions not subject to antitrust liability). PaintCare attempts to argue the "uncontested facts" show other recyclers had "much more experience and a proven track record of success." PaintCare Mot. at 11 n.4. This is a consideration for summary judgment—not a motion to dismiss. Consequently, taking Plaintiff's well-pleaded allegations as

true, it plausibly alleges an antitrust conspiracy.

The FAC alleges Defendants' conspiracy prevented Plaintiff from participating in the PaintCare Program, which in turn prevented millions of dollars of lower-priced recycled paint from entering the Bay Area market. FAC ¶¶ 17, 21, 47-48; Opp'n at 14. Plaintiff alleges it could have sold its recycled paint directly to consumers, had a contract with the City of Oakland, and was in discussion to sell to several other government entities in the Bay Area. FAC ¶¶ 17, 21[5]; *see Brantley*, 675 F.3d at 1198 ("[P]laintiffs must plead an injury to competition beyond the impact on the plaintiffs themselves."). Plaintiff has also alleged plausible facts that the market itself was injured by Defendants' anticompetitive conduct when they refused to allow Plaintiff to participate in the PaintCare program. *See Flagship Theatres*, 198 Cal. App. 4th at 1379-80 (conduct that is otherwise forbidden by the Cartwright Act "is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy"—an antitrust plaintiff "need not show that the market has actually become less competitive than it would have been without the defendant's conduct").

PaintCare's citation to its agreement with the City and County of San Francisco ("San Francisco") to make some reprocessed paint available to the public for free does not necessarily diminish the potential injury to competition and Bay Area consumers so as to make Plaintiff's claim implausible. *See* PaintCare Mot. at 1 (contending that under an agreement between PaintCare and San Francisco, reprocessed paint is made available to the public for free by San Francisco-managed facilities, *citing* PaintCare Request for Judicial Notice, Ex. K at p.6; Ex. M; Ex. N). As discussed above, the FAC alleges Plaintiff had the capacity to recycle large amounts of paint and to sell that paint to consumers in the Bay Area at a much lower cost than PaintCare's members sold virgin paint—but "Defendants conspired to exclude Plaintiff in order *to reduce and*

---

[5] These allegations counter PaintCare's arguments that (1) Plaintiff has not shown how its presence in the market would increase the amount of paint available (PaintCare Mot. at 14); (2) Plaintiff "does not allege any facts to support its speculation that without Plaintiff's particular Oakland recycling plant, there would be less recycled paint available to consumers in the Bay Area to compete with virgin paint" (PaintCare Reply at 2); and (3) "Plaintiff pleads no facts suggesting that the location of a recycler has any relationship to the availability of recycled paint in that same geographic area" (PaintCare Mot. at 9 (emphasis omitted)).

*control* the supply of recycled paint in the Bay Area market." Opp'n at 16 (emphasis added).
Even if the Court relied on PaintCare's evidence about the contract with the City and County of
San Francisco, as *Twombly* explicitly acknowledges, "a well-pleaded complaint may proceed even
if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very
remote and unlikely." 550 U.S. at 556 (internal quotation marks omitted).

At this point, Plaintiff's FAC adequately states a Cartwright Act claim.

**B.      UCL**

California's UCL proscribes three types of unfair competition: "practices which are
unlawful, unfair or fraudulent." *In re Tobacco II Cases*, 46 Cal. 4th 298, 311 (2009) (internal
quotation marks and citation omitted); *see also* Cal. Bus. & Prof. Code § 17200 (defining unfair
competition to include "any unlawful, unfair or fraudulent business act or practice"). "Each prong
of the UCL is a separate and distinct theory of liability," and "an independent basis for relief."
*Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) (citation omitted).
Plaintiff alleges Defendants' conduct violates all three prongs.

1.      Unlawful and Unfair Prongs

"By proscribing 'any unlawful' business practice, § 17200 borrows violations of other laws
and treats them as unlawful practices that the unfair competition law makes independently
actionable." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)
(internal quotation marks omitted). In other words, claims raised under the UCL's unlawful prong
rise or fall with the Court's determination of liability with respect to the underlying violation. *See
Krantz v. BT Visual Images*, 89 Cal. App. 4th 164, 178 (2001).

"[W]ith respect to business-competitor cases, to state a claim under the UCL's 'unfair'
prong the alleged unfairness must 'be tethered to some legislatively declared policy or proof of
some actual or threatened impact on competition.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th
Cir. 2014) (quoting *Cel-Tech Commc'ns*, 20 Cal. 4th at 186-87 (an act or practice is "unfair" under
the UCL only if the conduct "threatens an incipient violation of an antitrust law, or violates the
policy or spirit of one of those laws because its effects are comparable to or the same as a violation
of the law, or otherwise significantly threatens or harms competition.")). "[W]here the same

13

conduct alleged to be unfair under the UCL is also alleged to be a violation of another law, the UCL claim rises or falls with the other claims." *Hicks v. PGA Tour, Inc.*, 165 F. Supp. 3d 898, 911 (N.D. Cal. Feb. 9, 2016) (citation omitted).

Because the Court has found Plaintiff properly alleges a Cartwright Act violation, it finds Plaintiff has also sufficiently stated a UCL claim under the unlawful and unfair prongs. *See Prakashpalan v. Engstrom, Lipscomb & Lack,* 223 Cal. App. 4th 1105, 1133 (2014), *as modified on denial of reh'g* (Feb. 27, 2014) ("[A] violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong."); *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003) (UCL unfair prong claim "must be 'tethered' to specific constitutional, statutory or regulatory provisions." (citations omitted)). While Defendants challenge Plaintiff's allegations of injury under the UCL, the Court finds Plaintiff has also alleged sufficient injury to support its UCL claim: as a result of Defendants' agreement and concerted action to exclude Plaintiff from receiving paint under the PaintCare Program, Plaintiff suffered financial losses and consumers in the San Francisco Bay Area have been harmed. *See* FAC ¶¶ 17, 21, 47-48; Opp'n at 21.

### 3. Fraudulent Prong

"To establish an unfair competition claim under the fraudulent prong, plaintiffs must show that [the defendant's] representations were false or were likely to have misled reasonable consumers." *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1241 (2007) (internal quotation marks omitted); *see also State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1105 (1996) ("The test is whether the public is likely to be deceived. [Citation.] This means that a section 17200 violation, unlike common law fraud, can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. [Citation.]"). "The standard for finding a likelihood of deception is that of a reasonable consumer who is neither the most vigilant and suspicious of advertising claims nor the most unwary and unsophisticated, but instead is 'the ordinary consumer within the target population.'" *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1137 (N.D. Cal. 2014) (internal quotation marks omitted).

Defendants argue the FAC does not allege Defendants made representations to consumers, upon which consumers relied to their detriment. PaintCare Mot. at 18. As the Court pointed out

in its prior Order,

> Plaintiff is not clear about which Defendants made what misrepresentations to the public or how specifically they misled consumers regarding the costs of the Program or its benefits. *See* Fed. R. Civ. P. 9(b) ('a party must state with particularity the circumstances constituting fraud . . . .'). Without more, it cannot maintain its UCL claims under the fraud prong.

Order at 19. Plaintiff has not clarified these claims in its FAC, noting only in a conclusory fashion that "[D]efendants' actions violated state law, including California Public Resources Code § 48703(b)(4), resulted in an unfair competitive market for the sale of paint, reduced the choices that Bay Area consumers had when purchasing paint, and was conducted in an effort to mislead GreenCycle and the public." FAC ¶ 54. But there are no allegations about what representations Defendants made and when or how such representations were likely to mislead the public. While the Court can speculate about how Plaintiff may be able to assert such claims, at this point, it has failed to do so despite having an opportunity to cure the initial Complaint's deficiencies. As such, the Court DISMISSES Plaintiff's UCL fraudulent practices claim WITHOUT LEAVE TO AMEND.

    4.   <u>Standing</u>

Clean Harbors also challenges Plaintiff's standing to bring a UCL claim. Clean Harbors Mot. at 10. In order to have standing under the UCL, a plaintiff must show that it "has suffered injury in fact and has lost money or property as a result of such unfair competition." Cal. Bus. & Prof. Code § 17204. In addition, where a plaintiff alleges a UCL claim against multiple defendants, it must allege that it "suffered injury in fact or lost money or property as a result of alleged unfair competition" of each defendant. *Schulz v. Neovi Data Corp.,* 152 Cal. App. 4th 86, 92 (2007) (brackets omitted). Clean Harbors contends "Plaintiff merely alleges that it 'lost time and effort, lost profits and eventually GreenCycle was required to shut down because it was unable to obtain sufficient used paint . . . to continue to viably operate its recycling facility.'" Clean Harbors Mot. at 10 (quoting FAC ¶ 55). But it contends this allegation is insufficient, "as Plaintiff does not allege the loss of money or Property as a direct result of [Clean Harbor]'s alleged conduct." *Id.*

The Court disagrees. As discussed above, Plaintiff alleges Clean Harbors and the other Defendants violated California's Cartwright Act and conspired to exclude Plaintiff from the recycled latex paint market. As a result of the exclusion, Plaintiff was allegedly unable to obtain used paint and had to close its business. These allegations are sufficient to show Plaintiff lost money or property as a result of all Defendants' acts. *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) ("The 'lost money or property' requirement . . . requires a plaintiff to demonstrate some form of economic injury as a result of his transactions with the defendant, . . . although the quantum of lost money or property necessary to show standing is only so much as would suffice to establish Article III injury in fact[.]" (internal quotation marks, citation, and brackets omitted)).

**C.   Safe Harbor Provision**

PaintCare argues Plaintiff's Cartwright Act and UCL claims are barred by the Safe Harbor Provision of California Public Resources Code ("PRC") section 48706. PaintCare Mot. at 18-21. PaintCare raised this issue in its first Motion to Dismiss; however, because the Court did not find Plaintiff stated a claim for either its Cartwright Act or UCL claim, it did not consider the applicability of the Safe Harbor Provision. Order at 5. The Court also noted that no other court had yet interpreted this provision and none of the parties had provided any legislative history and other materials that may have assisted the Court in interpreting this provision. *Id.* Now, as the Court has found Plaintiff has stated a claim for violations of the Cartwright Act and UCL against PaintCare, the Court must consider the Safe Harbor Provision.

1.   Interpretation of State Law

Federal courts interpreting a state law look to the state's rules of statutory interpretation and attempt to determine what meaning the state's highest court would give it. *See Turnacliff v. Westly*, 546 F.3d 1113, 1117-18 (9th Cir. 2008). The "ultimate task" in statutory interpretation "is to ascertain the legislature's intent." *People v. Massie*, 19 Cal. 4th 550, 569 (1998). California courts have established a three-step process of statutory interpretation to determine legislative intent. *See MacIsaac v. Waste Mgmt. Collection & Recycling, Inc.*, 134 Cal. App. 4th 1076, 1082 (2005) ("[T]he key to statutory interpretation is applying the rules of statutory construction in their

proper sequence.").

First, courts "scrutinize the actual words of the statute, giving them a plain and commonsense meaning." *Gomez v. Superior Court*, 54 Cal. 4th 293, 300 (2012) (quoting *Goodman v. Lozano*, 47 Cal. 4th 1327, 1332 (2010)). If the "language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary." *Id.* (quoting *Ste. Marie v. Riverside Cty. Reg'l Park & Open-Space Dist.*, 46 Cal. 4th 282, 288 (2009)). When the wording of the statute is ambiguous or permits more than one reasonable interpretation, courts move to the second step of the inquiry. *See Alejo v. Torlakson*, 212 Cal. App. 4th 768, 787 (2013). In this step, a court may turn to secondary rules of interpretation, such as "maxims of construction," *People v. Smith,* 32 Cal. 4th 792, 798 (2004), "the statutory scheme of which the provision is a part, the history and background of the statute, the apparent purpose, and any considerations of constitutionality," *Hughes v. Bd. of Architectural Exam'rs*, 17 Cal. 4th 763, 776 (1998). "If ambiguity remains after resort to secondary rules of construction . . . then [courts] must cautiously take the third and final step in the interpretive process." *Alejo*, 212 Cal. App. 4th at 788. In this step, courts apply "reason, practicality, and common sense to the language at hand." *Id.*

    2.    <u>Statutory Language & Analysis</u>

The Court finds the Safe Harbor Provision's plain language does not bar Plaintiff's claims. PRC section 48706 states:

> (a) Except as provided in subdivision (c), an action solely to increase the recycling of architectural paint by a producer, stewardship organization, or retailer that affects the types or quantities being recycled, or the cost and structure of any return program, is not a violation of the statutes specified in subdivision (b).

> (b) The following statutes are not violated by an action specified in subdivision (a):

> (1) The Cartwright Act (Chapter 2 (commencing with Section 16700) of Part 2 of Division 7 of the Business and Professions Code).

> (2) The Unfair Practices Act (Chapter 4 (commencing with Section 17000) of Part 2 of Division 7 of the Business and Professions Code).

> (c) Subdivision (a) shall not apply to any agreement establishing or affecting the price of paint, except for the architectural paint stewardship assessment, or the output or production of paint, or any agreement restricting the geographic area or customers to which paint will be sold.

Cal. Pub. Res. Code § 48706.

PaintCare interprets section 48706 to protect it from both of Plaintiff's claims. It contends Plaintiff's allegations concern the "types or quantities [of paint] being recycled, or the cost and structure" of the "return program." PaintCare Mot. at 20 (quoting Cal. Pub. Res. Code § 48706(a)). As such, PaintCare argues "Plaintiff []cannot avoid the Safe Harbor unless it alleges facts showing an 'agreement establishing or affecting the price of paint, except for the architectural paint stewardship assessment, or the output or production of paint, or any agreement restricting the geographic area or customers to which paint will be sold.'" *Id.* (quoting Cal. Pub. Res. Code § 48706(c)). PaintCare contends this must involve agreements to engage in the type of price fixing, supply manipulation, or territorial market allocations that are the standard target of the Cartwright Act. *Id.* (citing Cal. Anti. & Unfair Comp. L. § 2.07, *Market Allocation Agreements*). PaintCare avers Plaintiff has not alleged such facts and urges the Court to prohibit Plaintiff's claims under the Safe Harbor, arguing "Plaintiff's attempt through this litigation to change this important statutory program so as to advance its own private financial interests is exactly what the Safe Harbor Provision is designed to prevent." *Id.* at 21.

Plaintiff does not disagree that it is challenging an action related to "types or quantities [of paint] being recycled, or the cost and structure" of the "return program." Plaintiff instead focuses on the first part of section 48706(a), which limits application of the safe harbor protections to "an action solely to increase the recycling of architectural paint by a . . . stewardship organization[.]" Cal. Pub. Res. Code § 48706(a). As Plaintiff points out, PaintCare's Motion "ignores the initial clause of Section 48706(a) (providing protection only to actions 'solely to increase the recycling of architectural paint')[.]" Opp'n at 20. Plaintiff interprets the Safe Harbor to "only appl[y] to actions taken in order to increase the amount of recycled paint that also affect the types or quantities of paint that is being recycled or the cost structure of the return program." *Id.*

Plaintiff emphasizes that it has alleged "that rather than taking action solely to increase the

18

recycling of architectural paint, PaintCare's actions excluded GreenCycle and other latex paint recycling facilities from entering the San Francisco Bay Area market." Opp'n at 20 (citing FAC ¶¶ 45, 53). This, "even when viewed in a light most favorable to PaintCare, either reduced or had no overall impact on the recycling of architectural paint." *Id.* Put another way, Plaintiff contends the Safe Harbor Provision is implicated "if PaintCare modifies the surcharge on all paint sold across the state in order to increase recycling[;] that action would be protected by the safe harbor provision." *Id.* "But[] entering into a conspiracy with the haulers to prevent a recycling facility from operating in the Bay Area is not an act solely to increase the recycling of architectural paint and, for that simple reason, is not covered by the safe harbor provision." *Id.*

PaintCare appears to attack Plaintiff's interpretation of the Safe Harbor's limitation to discrete actions "solely" to increase the recycling of architectural paint. *See* PaintCare Reply at 13-14. PaintCare states:

> Plaintiff argues that its claims do not fall within the scope of the safe harbor provision because it has not alleged conduct that was taken by "a producer, stewardship organization, or retailer" "solely to increase the recycling of architectural paint . . . that affects the types or quantities being recycled, or the cost and structure of the return program." Opp. at 19 (*quoting* PRC § 48706). Plaintiff cannot escape the safe harbor so easily. As this Court found, Plaintiff's allegations "appear[] to run counter to the whole purpose of PaintCare's mission under the Program and for which CalRecycle has selected PaintCare." Order at 9:13-15. Theoretically, any one component of the Program – whether it be, *e.g.*, the selection of recyclers or the location of collection bins or the terms of PaintCare's contracts with the haulers – could be claimed in isolation to not be necessary to increase recycling. But the Program as a whole – as confirmed by CalRecycle – is designed solely to increase recycling, and PaintCare's decisions in implementing the components of that Program must be covered by the safe harbor for that provision to have any meaning.

PaintCare Reply at 13 (italics in original). PaintCare thus contends the Safe Harbor Provision protects any actions taken pursuant to the Program, which it asserts "is designed to increase the recycling of architectural paint." Suppl. Br. at 3, Dkt. No. 67. PaintCare argues without citation that its "decisions in implementing the components of that Program must be covered by the safe harbor for that provision to have any meaning." PaintCare Reply at 13; *see* Suppl. Br. at 4 ("To provide any possible safe harbor; *i.e.*, to have any possible meaning or effect, the words 'an action

solely to increase the recycling of architectural paint' must refer to the paint stewardship program as a whole.").

The Court disagrees that the Safe Harbor Provision should be interpreted so broadly. Courts "presume the Legislature intended everything in a statutory scheme, and . . . do not read statutes to omit expressed language or to include omitted language." *Tyrone W. v. Superior Court*, 151 Cal. App. 4th 839, 850 (2007). Section 48706 does not define "an action" to mean any action taken to implement the paint stewardship program, and PaintCare provides no support for this interpretation. Section 48706 does, however, set specific parameters as to what actions are protected. The Safe Harbor Provision identifies only one type of protected action and the laws which such an action does not violate: it shields "[1] an action solely to increase the recycling of architectural paint [2] by a producer, stewardship organization, or retailer that [3] affects the types or quantities being recycled, or the cost and structure of any return program" from Cartwright Act or the UCL claims. Cal. Pub. Res. Code § 48706(a)-(b).

Indeed, PaintCare's interpretation ignores the Safe Harbor's requirement that the action must be one "solely to increase the recycling of architectural paint." This limitation suggests only certain actions are protected, namely, those that increase the amount of recycled paint. If PaintCare engaged in acts that increased the amount of recycled paint, such conduct would be consistent with the purpose of the Program; in that case, protection from antitrust lawsuits is appropriate. But that is not what Plaintiff alleges occurred. Taking Plaintiff's well-pleaded allegations as true as the Court must in considering Defendants' Motions to Dismiss, PaintCare took steps to *decrease* the availability of recycled paint, which Plaintiff alleges is contrary to the Program's purpose.[6] *See* FAC ¶ 13 (shipping paint out of state "violate[s] the statutory program goals"). Moreover, Plaintiff alleges PaintCare's sole purpose in diverting paint away from Plaintiff was to "prevent[] a recycling facility from operating in the Bay Area and [to] limit[] the amount of paint being recycled for sale in California." FAC ¶ 31. The Safe Harbor Provision is

---

[6] To the extent PaintCare relies on CalRecycle's approval of its plans as proof that it sought to fulfill the Program's goal, the Court declines to consider such evidence at the motion to dismiss stage.

silent as to a stewardship organization's actions taken to decrease the recycling of architectural paint.

PaintCare cannot hide behind the stated purpose of the Program. *See* PaintCare Reply at 13 ("But the Program as a whole . . . is designed solely to increase recycling, and PaintCare's decisions in implementing the components of that Program must be covered by the safe harbor for that provision to have any meaning."). It is undisputed that "[t]he purpose of the architectural paint recovery program . . . is to require paint manufacturers to develop and implement a program to collect, transport, and process postconsumer paint to reduce the costs and environmental impacts of the disposal of postconsumer paint in this state." Cal. Pub. Res. Code § 48700. Simply because the Program has a purpose does not mean PaintCare's decisions were in accordance with that goal. Again, this is what Plaintiff alleges: by conspiring to exclude Plaintiff from the PaintCare Program, PaintCare sought to decrease the amount of recycled paint—contrary to the purpose of the Program.

In short, the Court cannot find the Safe Harbor Provision's plain language is meant to immunize any action taken pursuant to the Program from claims under the Cartwright Act or the UCL. Rather, the plain language indicates only "actions solely to increase the recycling of architectural paint" are protected from antitrust suits. The Safe Harbor Provision therefore does not apply where, as here, the defendant allegedly took steps to decrease paint recycling.

### 3. Legislative History

The legislative history of the Architectural Paint Recovery Program supports the preceding analysis. Initial drafts of the Safe Harbor Provision were significantly broader than the current version. On February 27, 2009, Assembly Member Huffman introduced AB 1343, which established the Program. Dkt. No. 51-2 at ECF p.2; *see id.* at ECF p.200. AB 1343 contained a safe harbor provision that provided that

> [a]ny action taken by a manufacturer or representative organization regarding the cost recovery system or the collecting, transporting, or processing of postconsumer paint, pursuant to the requirements of this chapter and only to the extent necessary to plan and implement the cost recovery system, collection system, or recycling system, is not a violation of the Cartwright Act (Chapter 2 (commencing with

> Section 16700) of Part 2 of Division 7 of the Business and Practices
> Code), the Unfair Practices Act (commencing with Section 17000)
> of Part 2 of Division 7 of the Business and Professions Code), or
> any other state law relating to antitrust, regulation of trade, or
> regulation of commerce.

Dkt. No. 51-2 at ECF pp.4-5. This version remained unchanged when the California Assembly amended the bill on May 2, 2009. *See id.* at ECF pp.8-9. The Senate's June 24, 2009 amendments left this provision substantively the same as well. *See id.* at ECF pp.18-19.

Several local governments and agencies supported a limited antitrust exemption. The City and County of San Francisco, Sonoma County Waste Management Agency, and the City of Buenaventura opined that "[t]he bill should . . . include language providing the paint manufacturers protection from any anti-trust violation claims to allow them to work together to develop a stewardship organization solely for the purposes of establishing a statewide stewardship program for paint. *The exemptions should be very limited only to compliance with this program.*" Dkt. No. 51-3 at ECF pp.25, 48, 56 (emphasis added). Napa County similarly supported AB 1343 provided it were amended to "include language providing the paint manufacturers protection from any anti-trust violation claims to allow them to work together to develop a stewardship organization <u>solely</u> for the purposes of establishing a statewide stewardship program for paint." *Id.* at ECF p.53 (emphasis in original).

In conjunction with a July 6, 2009 hearing on the bill, the Senate Committee on Environmental Quality recommended the "[r]emov[al] of the provisions related to anti-trust and trade issues . . . [to] allow the author to find another approach to address these issues." Dkt. No. 51-2 at ECF p.198. The July 13, 2009 amendment eliminated the safe harbor provision in its entirety. *Id.* at ECF p.27.

A safe harbor provision was reintroduced on January 7, 2010. *See* Dkt. No. 51-4 at ECF p.103. This version provided a narrower exemption than the initial iteration; it set forth in subdivision (a) two specific actions that would not constitute an antitrust violation:

> (1) Establishing and levying an architectural paint stewardship
> assessment for each container of architectural paint sold by a
> manufacturer in this state.
> (2) Developing and implementing a recovery program to reduce the
> generation of postconsumer architectural paint, to promote the use

of postconsumer architectural paint, and to manage the end-of-life of postconsumer architectural paint, including collection, transportation, processing, and disposal.

*Id.* It also added for the first time a provision that "Subdivision (a) shall not apply to any agreement establishing or affecting the price of paint, except for the architectural paint stewardship assessment, or the output or production of paint, or any agreement restricting the geographic area or customers to which paint will be sold." *Id.*

On August 10, 2010, the Senate amended AB 1343 to contain the current version of the safe harbor provision.[7] Dkt. No. 51-2 at ECF p.39. It "[l]imit[ed] the anti-trust exemption for stewardship activities related to the product stewardship assessment or the output or production for paint or any agreement restricting the geographic area or customers to which paint will be sold." Dkt. No. 51-4 at ECF p.119. Governor Arnold Schwarzenegger approved AB 1343 on September 28, 2010. Dkt. No. 51-2 at ECF pp.40-46; *see id.* at ECF p.48.

PaintCare asserts without citation that "[t]he purpose of the safe harbor is to protect stewardship organizations from having to defend against legal claims by private parties that would challenge how the Program is being implemented." PaintCare Reply at 14. PaintCare further argues—again without citation—that "[t]he Legislature . . . was concerned with exempting the

---

[7] The August 10, 2010 amendment of AB 1343 stated:

(a) Except as provided in subdivision (c), an action solely to increase the recycling of architectural paint by a producer, stewardship organization, or retailer that affects the types or quantities being recycled, or the cost and structure of any return program, is not a violation of the statutes specified in subdivision (b).
(b) The following statutes are not violated by an action specified in subdivision (a):
(1) The Cartwright Act (Chapter 2 (commencing with Section 16700) of Part 2 of Division 7 of the Business and Professions Code).
(2) The Unfair Practices Act (Chapter 4 (commencing with Section 17000) of Part 2 of Division 7 of the Business and Professions Code).
(c) Subdivision (a) shall not apply to any agreement establishing or affecting the price of paint, except for the architectural paint stewardship assessment, or the output or production of paint, or any agreement restricting the geographic area or customers to which paint will be sold.

Dkt. No. 51-2 at ECF p.39.

United States District Court
Northern District of California

paint stewardship program from having to defend antitrust lawsuits.  That intent is only effectuated if the 'action' in question is the paint stewardship program itself."  Suppl. Br. at 4 (emphasis in original); *see id.* ("To provide any possible safe harbor; *i.e.*, to have any possible meaning or effect, the words 'an action solely to increase the recycling of architectural paint' must refer to the paint stewardship program as a whole.").

The legislative history suggests otherwise: the amendments to section 48706 show a progressive narrowing of the Safe Harbor Provision.  Whereas the first version of AB 1343 broadly provided that "[a]ny action taken by a manufacturer or representative organization regarding the cost recovery system or the collecting, transporting, or processing of postconsumer paint" (Dkt. No. 51-2 at ECF p.4-5) was immune from antitrust actions, the current version limits that protection to "an action solely to increase the recycling of architectural paint by a producer, stewardship organization, or retailer that affects the types or quantities being recycled or the cost and structure of any return program" (Cal. Pub. Res. Code § 48706(a)).  Indeed, in a corrected Report on Enrolled Bill submitted to Governor Schwarzenegger clarified that section 48706 "would provide that certain actions taken pursuant to the program . . . do not violate the Cartwright Act or the Unfair Practices Act."  Dkt. No. 51-5 at ECF p.61.  By noting that only "certain actions" would fall under the Safe Harbor Provision, it is clear that the Safe Harbor was not intended to be as all-encompassing as PaintCare argues.  Moreover, the ACA—PaintCare's alleged creator and sole member—endorsed this narrow exemption.  *See* Dkt. No. 51-4 at ECF p.51.  In an August 10, 2010 joint memorandum with the California Paint Council ("CPC") to the Senate Appropriations Committee, the ACA and the CPC stated that "[w]e also appreciate the assistance of the Senate Judiciary Committee in finalizing *a narrow antitrust provision* to enable the paint stewardship organization authorized in the bill to operate effectively."  *Id.* (emphasis added).

As such, the Court finds section 48706's legislative history shows that the Safe Harbor Provision is not intended to protect all actions taken under the Program, but rather only those actions that are specified in the statute.

//

4.      Reason, Practicality, and Common Sense

In the third step of the statutory interpretation analysis, courts interpret the statutory language "to make [it] workable and reasonable" and "consider the consequences that will flow from a particular statutory interpretation." *In re A.M.*, 225 Cal. App. 4th 1075, 1081 (2014) (internal quotation marks omitted).

The above findings do not negate the Safe Harbor's effectiveness and comport with reason, practicality, and common sense. PaintCare asserts the "[t]he Safe Harbor provision makes no sense and serves no purpose if it is not a legal defense to GreenCycle's antitrust lawsuit arising out of the operation of the paint stewardship program." Suppl. Br. at 7. On the contrary, it serves a purpose: by protecting those actions that increase the recycling of paint, the Safe Harbor allows entities to carry out the Program's goal without fear of litigation, but it allows an antitrust suit where a defendant's acts are allegedly antagonistic to the Program. This interpretation is both workable and reasonable.

5.      Summary

At this point, the Court finds the Safe Harbor Provision does not shield PaintCare from Plaintiff's claims. PaintCare may be able to demonstrate that its actions in fact increased the paint recycling; however, at this stage, Plaintiff has alleged sufficient facts to show that the Provision does not apply.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motions to Dismiss as to Plaintiff's UCL fraudulent practices claim but **DENIES** the Motions in all other respects.[8] The Court shall hold a Case Management Conference on May 18, 2017 at 10:00 a.m. in Courtroom B, 15th Floor, 450 Golden Gate Avenue, San Francisco, California. This conference shall be attended by lead trial counsel.

---

[8] PaintCare and Plaintiff filed requests for judicial notice. *See* PaintCare RJN, Dkt. No. 53; Pl. RJN, Dkt. No. 58. Because the Court does not rely on the documents sought to be judicially noticed, the Court **DENIES** both requests **AS MOOT**. *See McLaughlin v. Wells Fargo Bank, NA*, 2015 WL 10889993, at *2 (N.D. Cal. Oct. 29, 2015).

No later than seven calendar days before the Case Management Conference, the parties shall file a Joint Case Management Statement containing the information in the Standing Order for All Judges in the Northern District of California, available at: http://cand.uscourts.gov/mejorders. The Joint Case Management Statement form may be obtained at: http://cand.uscourts.gov/civilforms.  If the statement is e-filed, no chambers copy is required.

**IT IS SO ORDERED.**

Dated: April 11, 2017

_____
MARIA-ELENA JAMES
United States Magistrate Judge